FILED

FEB 12 2010

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 08-10386 |
| Plaintiff-Appellee, | D.C. No. 1:07-cr-00194-LJO |
| v. | |
| BRADLEY SMITH, | MEMORANDUM[*] |
| Defendant-Appellant. | |

Appeal from the United States District Court
for the Eastern District of California
Lawrence J. O'Neill, District Judge, Presiding

Argued and Submitted October 8, 2009
San Francisco, California

Before: SCHROEDER and BERZON, Circuit Judges, and SHADUR,[**] Senior District Judge.

Bradley Smith ("Smith") appeals his criminal conviction and sentence on two charges: (1) interfering with housing rights in violation of 42 U.S.C. § 3631(a)

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

[**] The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

and (2) making a false statement in violation of 18 U.S.C. § 1001(a)(2).[1] We affirm.

## Background

Smith, a 22-year-old white male, and Alfred Henderson ("Henderson"), a 52-year-old African American, were active participants in the citizens' band ("CB") radio community in Modesto, California. Interactions between Smith and Henderson became hostile as Smith began to use offensive language and racial slurs directed at Henderson. Smith also threatened to hang Henderson in a tree, throw a "Molotov cocktail" at his house and rape and assault Henderson's wife. In the fall of 2005 Henderson and Smith arranged to meet in person at a gas station, where Henderson asked Smith to leave him alone and to stop making threats toward him. Smith agreed to stop and did so for about a week, but the threats and offensive language then began again.

On October 28, 2005 Smith and Henderson had an exchange over CB radio during which Smith told Henderson that he and his friends were going to come to Henderson's house to burn a cross, hang Henderson in a tree and rape his wife. Tired of being harassed, Henderson told Smith, "Come on over, if that's what you

---

[1] Further citations to Title 18 provisions will take the form "Section --," omitting the prefatory "18 U.S.C."

want to do." Henderson then called the police to inform them that Smith was coming over to hurt him and to burn a cross on his lawn. True to the first part of his threat, Smith arrived at Henderson's home with six or seven other people. Henderson met Smith in the middle of the street, and Smith began to abuse Henderson orally. Police arrived shortly thereafter--before the situation could escalate further. Those officers made no arrests at the time and let everyone leave.

FBI agent Kenneth Tam ("Tam") began to investigate those incidents and interviewed Smith several times. Each time Smith was interviewed, he was informed of his rights and he confirmed that he was speaking voluntarily. After hearing that other CB users had testified before a federal grand jury in the investigation, Smith asked Tam if he could testify as well.

During a meeting with Tam and several government attorneys the night before he was scheduled to testify, Smith asked whether the government would supply him with an attorney. One of the government attorneys told Smith that he had no right to an attorney because he had not yet been charged with any crime.[2] Smith continued to speak with the attorneys and agreed to testify before the grand

---

[2] In fact, the Criminal Justice Act Plan for the Eastern District of California does provide for legal representation of investigative targets in some circumstances. But that subject need not be explored further, for Smith's contentions in that respect do not entitle him to relief even if the response given him was in error.

3

jury the next day voluntarily, without being subpoenaed. At the beginning of his testimony, Smith confirmed that he wanted to testify despite knowing that he could not have an attorney appointed to represent him. Smith was also informed of his privilege against self-incrimination under the Fifth Amendment and invoked it on two occasions before the grand jury.

Smith was later indicted, tried and convicted. During his trial Smith proposed to call Christopher Lindley ("Lindley") as an opinion witness to "testify as to the unique role played by swagger, insults and aggressive statements in the CB universe, and distinguish between bluffs and an expression of actual intent to do harm" and "to testify that in the context of the CB radio culture, they are not serious threats, that operators typically talk that way because that's all they've got." Smith sought to establish Lindley as an expert based on his experience listening to CB radio for over twenty years.

After an evidentiary hearing during which Lindley testified outside the presence of the jury, the district court excluded Lindley as an opinion witness under Fed. R. Evid. 702. It concluded that Lindley did not have the specialized knowledge required for his proposed testimony and that the trier of fact would not be assisted by that testimony. Moreover, said the court, Lindley did not have the appropriate qualifications or training on the psychological aspects of listening to

4

CB radio, nor would his testimony be based on sufficient facts or data such that it could be considered reliable.

After Smith was convicted by the jury, the pretrial services officer filed a Presentence Investigation Report ("PSR") that calculated Smith's total offense level for Counts One and Two as 22. Smith's base offense level for Count One was found to be 12, to which six levels were added pursuant to Sentencing Guideline (hereafter "Guideline") § 2A6.1(b)(1) (intent to carry out threats) and two levels were added as recommended under Guideline § 2A6.1(B)(2) because the offense involved more than two threats. Another two levels were added pursuant to Guideline § 3B1.1(a) because Smith had a leadership role in the offense. Finally, the PSR concluded the district court should determine whether an enhancement for hate crime motivation was applicable under Guideline § 3B1.1(a). Smith's base offense level for Count Two was 6, and the PSR found that no adjustments or enhancements were applicable. Hence the final combined offense level was determined to be 22, and the PSR calculated the Guideline sentencing range as calling for 51 to 63 months' imprisonment.

At sentencing the district court adopted the recommendations of the PSR and also applied a three-level enhancement for hate crime motivation. As a result the district court held that the applicable offense level was 25, resulting in an advisory

Guideline range of 70 to 87 months' imprisonment. After considering the Section 3553(a) factors, the district court imposed a sentence of 78 months' imprisonment, to be served concurrently on Counts One and Two.

## Fifth Amendment Issues

We review de novo the district court's ruling on a claim of Fifth Amendment privilege (*United States v. Anderson*, 79 F.3d 1522, 1525 (9th Cir. 1996)). Violations of that privilege are reviewed for harmless error (*United States v. Lopez*, 500 F.3d 840, 844 (9th Cir. 2007)). Constitutional errors are harmless if "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained" (*Neder v. United States*, 527 U.S. 1, 15 (1999), quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)).

Smith argues that the district court erred in admitting statements he made to the grand jury because those statements were made after he was falsely advised that he could not have counsel appointed for him. That misrepresentation, he claims, improperly influenced his decision to testify before the grand jury, so that his statements were not truly voluntary.

While the Fifth Amendment does prohibit compelled self-incrimination, it "does not preclude a witness from testifying voluntarily in matters which may incriminate him" (*United States v. Washington*, 431 U.S. 181, 186-87 (1977),

6

quoting *United States v. Monia*, 317 U.S. 424, 427 (1943)). As *Beaty v. Schriro*, 509 F.3d 994, 999 (9th Cir. 2007), quoting *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (brackets inserted), teaches:

> In other words, a statement may be considered involuntary if it is "extracted by any sorts of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence."

Smith argues that he was under significant pressure to talk and that his statements were not voluntary because he was a target of the investigation and because of the "moderately coercive environments of the FBI office and grand jury room." But testifying before a grand jury does not of itself create a presumption that such testimony is coerced, even "if in that setting a witness is more likely to tell the truth than in less solemn surroundings" (*Washington*, 431 U.S. at 188). Moreover, whether a defendant is a target of an investigation plays little if any role in a Fifth Amendment analysis (see *id*. at 189).

Smith also argues that the government failed to obtain an intelligent and informed waiver of his Fifth Amendment rights after he asked about the availability of appointed counsel. Although he was admittedly not in custody at the time--the traditional setting that triggers the need for such waiver--he claims the government is required to demonstrate the existence of an unequivocal and

intelligent waiver under *Smith v. United States*, 337 U.S. 137 (1949) and *Emspak v. United States*, 349 U.S. 190 (1955).

Those cases, however, offer no support for Smith's contention that the government's failure to advise him accurately about his access to counsel somehow rendered his statements involuntary or caused his waiver of his Fifth Amendment rights to be insufficiently informed. Nothing in either case supports his claim that by simply asking about the *availability* of counsel he invoked his Fifth Amendment rights and triggered the need for an informed and intelligent waiver. There can be no doubt from the record that Smith was not compelled to speak to the FBI before his grand jury testimony or to testify before the grand jury itself. Smith himself initiated both his initial interview with Tam and his grand jury testimony. He knew that he did not have to testify before the grand jury and that, if he did, he did not have to incriminate himself.

In any event, Smith's grand jury testimony that was read to the jury at trial (most of his grand jury testimony was redacted and not placed before the trial jury) was merely cumulative of other evidence presented against him at trial. And as the government points out, there was consistent and overwhelming testimony from other trial witnesses as to Smith's harassment of Henderson over the CB radio and the events of October 28. That testimony was in most cases significantly more

detailed and extensive than the statements made by Smith to the grand jury, rendering any error in admitting his statements harmless (see *Padilla v. Terhune*, 309 F.3d 614, 622 (9th Cir. 2002)). We therefore uphold the jury's verdict in that respect.

### Exclusion of Opinion Testimony

We review a district court's decision to exclude opinion testimony for abuse of discretion. Such a ruling "will be reversed only if 'manifestly erroneous'" such that the "nonconstitutional error more likely than not affected the verdict" (*United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000)).

Smith argues that the district court abused its discretion in excluding Lindley's proposed testimony because its ruling was based on the erroneous view that the testimony required him to possess scientific or technical knowledge. But as the district court recognized, Smith sought to admit Lindley's proposed opinion on the basis of specialized knowledge rather than scientific or technical knowledge. On that score Lindley possessed no specialized knowledge or training other than whatever he might have gleaned from his years as a member of the CB radio community himself (and he had almost no knowledge of the local CB community). In any event, nothing in his experience enabled him to testify as to the intent behind statements made by other CB users.

9

Smith also argues that the district court erred in finding that Lindley's proffered testimony would not assist the jury. But what Lindley proposed to testify about was the seriousness of the threats made over CB radio--not about the meaning of obscure language or uncommon activities. As the district court noted, there is no reason to believe that a jury would need help in determining the plain meaning of such language.

Finally, Smith contends that the district court abused its discretion in excluding Lindley's testimony on the basis that it could not be considered reliable. But as we said in *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002) (emphasis in original):

> A trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability.

According to Smith, because the reliability of Lindley's testimony depended on his own knowledge and experience, rather than a particular methodology or theory, the traditional *Daubert* or *Kumho* factors were not applicable to that analysis. But the district court based its ruling not on the types of principles or methods employed by Lindley, but rather by concluding that there *were* no principles or methods that Lindley proposed to apply. Instead, said the court, Lindley's opinion "is simply all subjective listening and analysis and conclusions."

We find that the district court did not abuse its discretion in excluding Lindley's testimony.

## Sentencing Considerations

We review a "district court's interpretations of the Sentencing Guidelines *de novo*, the district court's application of the Guidelines to the facts for abuse of discretion, and the district court's factual findings for clear error" (*United States v. Garro*, 517 F.3d 1163, 1167 (9th Cir. 2008)).  Procedural errors, such as the failure to consider the Section 3553(a) factors properly, are reviewed for abuse of discretion (*United States v. Carty*, 520 F.3d 984, 993 (9th Cir. 2008)).

Smith first contends that the district court clearly erred when it added a six-level enhancement under Guideline § 2A6.1 because there was insufficient evidence to support its finding that the offense involved conduct evidencing an intent to carry out his threats against Henderson.  According to Smith, the failure of the district court to specify which threats controlled the application of the sentencing enhancement is itself reversible error.

But Smith offers no authority that requires the district court to particularize which threats formed the basis for its application of the sentencing enhancement. Unless the evidence could not show that Smith intended to carry out any of those threats, there is no reason why the sentencing enhancement should not be upheld.

11

In that respect Smith argues that "there was no evidence that [he] had ever taken any steps to carry out threats of violence against Mr. Henderson at any time." That is simply not the case, especially in light of the standard that Smith himself articulated for evaluating the scope and weight of such evidence. According to Application Note 1 to Guideline § 2A6.1, the court, in determining whether the offense involved conduct evidencing an intent to carry out the threat, "shall consider both conduct that occurred prior to the offense and conduct that occurred during the offense; however, conduct that occurred prior to the offense must be substantially and directly connected to the offense, under the facts of the case taken as a whole." But as *United States v. Hines*, 26 F.3d 1469, 1474 (9th Cir. 1994) explains, that inquiry is a flexible one:

> The purpose of the enhancement is clear: Defendants who act on their threats are more dangerous, and therefore, deserve more punishment. The critical issue should not be the timing of the conduct, but whether the conduct shows the defendant's intent and likelihood to carry out the threats.

As the district court found, Smith made repeated threats to Henderson over the CB radio. On October 28, after Smith had made further threats of physical violence - threats that specifically involved Smith going to Henderson's home - Smith and a half dozen or so of his friends drove to Henderson's house and got out of their cars to approach Henderson. It would have been myopic to consider that

12

Smith gathered that assemblage simply to assist him in an oral exchange with Henderson. Nor did Smith leave or retreat from Henderson's home on his own - he did so only because police officers arrived to break up the gathering.

Unlike what Smith suggests, police need not have found weapons, racist posters, insignia or literature at the scene for the enhancement to apply. In light of the very short time between Smith's threats to Henderson over the CB radio and his actions of gathering his friends and driving to Henderson's home, there was adequate evidence for the district court to find that Smith's conduct evidenced his intent to carry out such threats.

Second, Smith asserts that the district court erred in applying a three-level hate crime motivation enhancement because the jury found that Henderson's race was a substantial motivating factor, rather than a primary motivation, for Smith's conduct. Smith argues that the hate crime motivation enhancement should not have been applied because the jury's finding was based on a lesser standard than is required for the sentencing enhancement: What the background commentary to Guideline § 3A1.1(a) says is that the enhancement applies when the factfinding jury finds beyond a reasonable doubt that a victim's race was a primary motivation for the offense, while the jury instruction required only a finding that Henderson's race was a substantially motivating factor. In contrast, the government argues that

the background commentary should not be given controlling weight because it establishes a higher standard than, and is therefore inconsistent with, the requirements of the Guideline language itself.

As the government observes, the Guideline language was developed to carry out Congress's directive in Section 280003 of the Violent Crime Control and Law Enforcement Act of 1994 ("Act § 280003"). That statute defines a "hate crime" as "a crime in which the defendant intentionally selects a victim...because of [his or her] race" and directs the Sentencing Commission to provide a sentencing enhancement "for offenses that the finder of fact at trial determines beyond a reasonable doubt are hate crimes" (Act § 280003, Pub. L. No. 103-322, 108 Stat. 1796 (1994)). Nothing in the statute specifies the degree to which the victim's race must be a motivating factor, and Guideline § 3A1.1(a) itself tracks the statutory language directly. Nor does Smith challenge the jury instruction that addressed the hate crime issue.

As there is thus no textual basis for applying a different standard to the sentencing than to the conviction for hate crimes, the commentary's "primary motivation" language cannot apply here (*Stinson v. United States*, 508 U.S. 36, 43 (1993); *United States v. Lambert*, 498 F.3d 963, 966 (9th Cir. 2007)). We therefore conclude that the jury's factual finding supported the imposition of the

hate crimes sentencing enhancement.

Third, Smith appeals the district court's application of a two-level enhancement under Guideline § 3B1.1(c) for his role in the offense. Guideline § 3B1.1(c) states that a two-level enhancement is appropriate "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)."

According to Smith the two-level enhancement was erroneous as a matter of law because the district court did not believe that there was insufficient evidence of other criminal participants, a necessary predicate to the enhancement for a defendant's role in an offense. Contrary to what Smith suggests, the district court did not say that it believed there were no other participants in the offense. All that can be gathered from its questions to the government during Smith's sentencing was that it was skeptical about whether all of the people that arrived at Henderson's home with Smith were the same individuals that had made racially threatening statements over the CB radio. Even if not all of them were, the district court could reasonably conclude that it was highly likely that at least one of them was. Hence the evidence did support a finding that there was at least one other participant involved in the offense.

Smith finally argues that the district court erred in failing to explain its

15

decision regarding his claim for a variance to avoid an unwarranted sentencing disparity under Section 3553(a)(6). As Smith acknowledges, while a district court must consider the factors listed in Section 3553(a) in arriving at a sentence, it "need not tick off each of the § 3553(a) factors to show that it has considered them" (*Carty*, 520 F.3d at 992). But Smith nevertheless contends that because he raised an argument as to the assertedly unwarranted sentencing disparity that would result from a sentence within the Guideline range, the district court erred by not specifically explaining why it was rejected.

During sentencing the district court said it had "received and reviewed the Defendant's sentencing memorandum and objections to the presentence report." Thus described, that review would have embraced Smith's disparity argument (*Carty*, 520 F.3d at 996). When the district court later discussed the Section 3553(a) factors, it noted what it considered to be the most relevant considerations. And as we found in *United States v. Becerril-Lopez*, 541 F.3d 881, 894 (9th Cir. 2008), such an explanation is amply sufficient where the district court states on the record that it considered the Section 3553(a) factors and speaks to what it views as the most salient features. Moreover, as *Becerril-Lopez*, *id*. at 895 states, it would be difficult to "imagin[e] why a sentence within the Guidelines range would create a disparity, since it represents the sentence that most similarly situated defendants

16

are likely to receive."

## Conclusion

In sum, we therefore affirm both Smith's conviction and the sentence imposed on him by the district court.

**AFFIRMED.**